UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | No. 22 CR 219-3 |
|---|---|
| v. | Judge John Tharp |
| REGINALD DANIELS | Magistrate Judge Gabriel A. Fuentes |

**GOVERNMENT'S MEMORANDUM
IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits this memorandum in support of its motion for pretrial detention of defendant REGINALD DANIELS. As outlined further below, the nature and circumstances of the charged offense, defendant's history and characteristics, and the weight of the evidence all demonstrate that no condition or combination of conditions will reasonably assure the safety of the community or defendant's appearance at trial. Accordingly, this Court should order that defendant be detained.

**I.    FACTUAL BACKGROUND**

On August 9, 2021, at approximately 10:48 a.m., defendant participated in a shootout with co-defendants ANTHONY HAYES and JAMARI WILLIAMS at the Premier Express Tire and Lube auto repair shop located on the 600 block of Torrence Avenue in Calumet City. The incident was captured on the store's video surveillance system. According to that footage, defendant and Individual A were standing in the repair shop parking lot when the shootout occurred. *See* Ex. 1 at 00:01.



HAYES and WILLIAMS ran into the parking lot and fired multiple rounds at defendant and Individual A before running back in the direction they came. *Id.* at 00:03-00:08.



Defendant and Individual A were both struck. After HAYES and WILLIAMS fled, defendant removed his own pistol from his waistband and fired multiple rounds at them as they ran away. *Id*. at 00:08-00:12.



Tragically, one of defendant's errant bullets entered a car driving near Torrence Avenue and struck Individual C, an innocent bystander, in the neck. Individual C was critically injured and is now paralyzed from the neck down.

After defendant fired his rounds, he entered the maintenance area of the repair shop, discarded his gun into a garbage can, and covered it with a cardboard box. Ex. 2 at 00:01-00:20.



An unidentified man then grabbed the garbage can and dragged it across the maintenance area. *Id.* at 00:21-00:30. He transferred the garbage can to another unidentified man, Ex. 3 at 9:30-10:00, who dragged it into the sales area of Ride and Shine Car Wash, the business directly next to Premier Express Tire and Lube. Ex. 4 at 00:01-00:15. The second man gave the garbage can to a third individual who dragged it into an interior room of the car wash and placed it in the corner. *Id.* at 00:15-00:37; Ex. 5 at 2:20-2:40.



Responding law enforcement officers secured the scene and later that evening, entered the room where defendants' gun was taken. Surveillance footage captured an officer retrieve the firearm from the garbage can. Ex. 6 at 00:36-4:10. Officers identified defendant's gun as a loaded Glock Model 22 .40 caliber pistol bearing serial number AESM464. Notably, the Glock was equipped with both an extended magazine and a "switch" attachment allowing it to fire fully automatic.

Officers interviewed defendant on the day of the shootout. During that interview, he lied and claimed that he never returned fire at HAYES or WILLIAMS.

## II. LEGAL STANDARD

Under the Bail Reform Act of 1984, 18 U.S.C. §§ 3142-3156, a defendant may be denied bail if the government demonstrates that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(e)(1). The government's

5

burden with respect to the risk of nonappearance is by a preponderance of the evidence. *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985). A conclusion that no conditions of release can reasonably assure the safety of the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *see also United States v. Salerno*, 481 U.S. 739, 742 (1987). To detain a defendant, the Court must only find that "the government met its burden on either of the two foregoing issues … and not both." *United States v. O'Donnell*, No. 20 CR 260, 2020 WL 3058098, at *2 (N.D. Ill. June 9, 2020) (Fuentes, Mag. J.) (citing *United States v. Ramirez*, 843 F.2d 256, 257 (7th Cir. 1988)).[1]

> Statutory factors to be considered in making this determination include:
>
> (1) the nature and circumstances of the offense charged, including whether the offense … involves a firearm … ;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

---

[1] The Bail Reform Act imposes a rebuttable presumption of detention for certain offenses, but the charged offense is not among them. *See* 18 U.S.C. § 3142(e)(3).

18 U.S.C. § 3142(g). Here, the § 3142(g) factors all weigh in favor of detention.

## III. ANALYSIS

### A. Nature and Circumstances of the Offense Charged

The nature and circumstances of defendant's misconduct are egregious. At the outset, *all* criminal gun offenses raise significant public safety concerns—that is why the Bail Reform Act guarantees a hearing for detention decisions involving "the possession or use of a firearm." *See* 18 U.S.C. § 3142(f)(1)(E). The threat to public safety is even more pronounced, however, in cases involving convicted felons. "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people." *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010). "[S]omeone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." *Id.* As a result, the Seventh Circuit has consistently affirmed the government's "important" interest in "preventing gun violence by keeping firearms away from persons, such as those convicted of serious crimes, who might be expected to misuse them." *Kanter v. Barr*, 919 F.3d 437, 448 (7th Cir. 2019). As outlined below, defendant is not only a multi-time felon, but also a prior felony gun offender.

Of course, defendant's actions extend far beyond mere possession, and his danger to the community is neither theoretical nor conjectural. He brazenly fired multiple gunshots toward a four-lane thoroughfare in broad daylight, grievously wounding Individual C in the process. With the assistance of at least three other

7

people, he then tried to dispose of his still-loaded pistol to avoid detection from law enforcement. *See United States v. Sabol*, 534 F. Supp. 3d 58, 82 (D.D.C. 2021) (noting that defendant's "destruction of evidence that could be used against him in a criminal prosecution unquestionably weighs against pre-trial release"). He continued that evasion by lying to police investigating the shootout. *See United States v. Perez*, 790 F. Supp. 2d 824, 827-28 (N.D. Ill. 2011) (Cole, Mag. J.) (noting defendant's "willingness to lie to government agents to prevent arrest" as "compelling evidence that he should continue to be detained").

The "nature of the firearm[]" itself constitutes another "legitimate Section 3142(g) concern." *See United States v. Rocha*, No. 19 CR 625, 2019 WL 4384465, at *5 (N.D. Ill. Sept. 11, 2019) (Fuentes, Mag. J.). Defendant's pistol was "small enough … to be easily concealed on someone's person," as demonstrated by its hidden placement in his waistband. *See id.* As a .40 caliber, it was a type of gun that "accommodate[d] larger-diameter ammunition," thereby increasing its lethality. *See id.* at *7 (citing City of Chicago, Office of the Mayor, "Gun Trace Report 2017" 12 (2017)). It was equipped with an extended magazine. *See id.* ("The greater the magazine capacity, the more shots can be fired … without reloading."). Most concerning, it was equipped with an automatic "switch" attachment that exponentially increased the threat posed. *See, e.g., United States v. O'Brien,* 560 U.S. 218, 230, (2010) (noting "[t]he immense danger posed by machineguns"); *United States v. Henry,* 688 F.3d 637, 640 (9th Cir. 2012) ("A modern machine gun can fire

more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns."); *United States v. Kirk,* 105 F.3d 997, 1001 (5th Cir. 1997) (*en banc*) (*per curiam*) (Higginbotham, J., concurring) ("Machine guns possess a firepower that outstrips any other kind of gun.").

Finally, it must be remembered that "the community where the Court is assessing the risk and danger of Defendant's release under Section 3142(g) is Chicago."[2] *See Rocha*, 2019 WL 4384465, at *6. This Court has previously noted that "[t]he available data suggests very strongly that the ... unlawful use [of] handguns contributes mightily to the public safety risk in Chicago." *Id.* According to the city's 2017 Gun Trace Report, since 2013, CPD has annually recovered nearly 7,000 "crime guns," meaning firearms that were illegally possessed, used, or suspected to be used in furtherance of a crime.[3] In 2016, when adjusted for population, Chicago recovered six times as many guns per capita as New York and 1.5 times as many guns per capita as Los Angeles. *Id.*

---

[2] Although the August 9, 2021 shootout occurred in Calumet City, defendant's permanent residence—his proposed bond location—is in Chicago.

[3] City of Chicago, *Gun Trace Report 2017* at 1, https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2017/October/GTR2017.pdf (last visited Apr. 18, 2022).

### B. History and Characteristics of the Defendant

Defendant's dangerousness and disobedience are further underscored by his extensive criminal history. *See Maryland v. King*, 569 U.S. 435, 453 (2013) ("[A]n arrestee's past conduct is essential to an assessment of the danger he poses to the public, and this will inform a court's determination whether the individual should be released on bail."). According to the Pretrial Services ("PTS") Report, he has had consistent involvement in the criminal justice system since the age of 15. His juvenile arrests involve burglary, robbery, and receipt/possession/sale of a stolen vehicle. He additionally has at least <u>seven</u> adult convictions that have occurred at alarming regularity over the last decade. They include misdemeanor convictions for disorderly conduct, criminal damage to property, domestic battery, as well as felony convictions for receipt/possession/sale of a stolen vehicle, manufacture/delivery of cannabis, aggravated fleeing police, and most recently, unlawful possession of a firearm by a convicted felon, the same misconduct at issue here. In short, it appears that defendant has spent all, or nearly all, of the approximately 12 years since his first adult conviction in September 2010 under some form of court supervision, pretrial release, probation, incarceration, or parole. All have failed to reform and deter his criminal behavior that culminated in the instant offense.

Moreover, defendant has been granted lesser means of restraint on multiple occasions, only to repeatedly violate his release conditions. In January 2010, for example, he received his first adult conviction (case number 10 CR 64701) for receipt/possession/sale of a stolen vehicle and was sentenced to two years' probation.

He violated his probation less than three months later and was arrested (and later convicted) of manufacture/delivery of cannabis. His probation was terminated unsatisfactory, and his sentence was elevated to a term in the Cook County Department of Corrections Boot Camp, then again increased to five years' imprisonment. He was finally paroled on April 6, 2012, only to be returned to the Illinois Department of Corrections ("IDOC") following additional misconduct.

Specifically, only *three weeks* after his parole release, he was arrested for disorderly conduct and criminal damage to property. He was sentenced to two years of conditional discharge in *that* case (case number 12 CM 595) on November 30, 2012. That still did not deter him, because despite being on both parole *and* conditional discharge, he committed domestic battery (case number 13 CM 319) in March 2013. He was convicted and sentenced to another year of conditional discharge and $1,678.86 in restitution in *that* case in May 2013, but then failed to appear in August 2014, August 2015, and March 2018, resulting in the issuance of multiple arrest warrants. Nearly nine years after his conviction, he still owes half of his restitution balance. In May 2014, while still under conditional discharge, he was arrested in Georgia for disorderly conduct. A failure to appear warrant was entered in that case in July 2014 which remains active to this day.

Defendant's criminal behavior since 2015 especially highlights the inadequacy of lesser conditions of restraint. He was arrested in May 2015 for both aggravated fleeing police and illegal gun possession. He was granted bond, but then failed to

appear less than two months later, resulting in a bond forfeiture and issuance of an arrest warrant. He was convicted in August 2015 and sentenced to five years' imprisonment.

The day before defendant's parole release in January 2018, he received a Project Safe Neighborhoods ("PSN") Notification Letter from IDOC. Ex. 7. That letter explicitly advised him that: (1) he could not "possess a gun or other dangerous weapons"; (2) "[a]s a convicted felon," he could be "prosecuted in federal court" for any future gun possession; and (3) possible punishments for additional gun offenses could include an extended period of incarceration in federal prison, which "has **no parole** and no 'day-for-a-day' good time credit." *Id.* (emphasis in original). Defendant acknowledged that he understood those admonishments by personally signing the Notification Letter. *Id.*

Despite those warnings, defendant was arrested for an additional gun offense in April 2019 (case number 19 CR 667001). He was granted bond, and once again, failed to appear less than two months later. *While still on bond*, he was arrested for theft (case number 19600509501) in September 2019, and again given pretrial release. *While on bond in that case*, he was arrested for *another* gun offense in September 2020 (case number 20111883001/21 CR 584301). He was again awarded pretrial release. *While on bond*, he was arrested for theft in July 2021 (case number 21500234301). He was again awarded pretrial release. *While ostensibly on bond in two separate cases* (case numbers 19600509501 and 21500234301), he committed the

gun crime in this case on August 9, 2021 (case number 21 CR 1229401). Inexplicably, defendant was granted yet another bond on September 1, 2021. Despite being on bond in case numbers 1960050950, 21500234301 *and* 21 CR 1229401, defendant failed to appear *two weeks later,* on September 16, 2021, and *another* arrest warrant was issued.

Defendant's prior conduct reinforces his danger to the community and consistent disregard for lesser means of restraint. There is no indication that will change should this Court grant him pretrial release.

### C. Weight of the Evidence

The evidence against defendant is overwhelming. His unlawful firearm possession, his gunshots that struck Individual C, and his attempt to hide his loaded automatic pistol were all captured on video surveillance. Moreover, as outlined above, both defendant's felon status and knowledge thereof are beyond reasonable dispute. "Very strong evidence, when coupled with the possibility of a very long sentence, is relevant to the likelihood of the accused's non-appearance at trial. Flight is always more likely when a defendant has little or nothing to lose by absconding." *United States v. Calabrese*, 436 F. Supp. 2d 925, 927 (N.D. Ill. 2006) (Zagel, J.). "The weight of the evidence is also relevant to the question of whether detention is justified by the need to protect the community." *Id.*

This Court has previously described the weight-of-the-evidence factor as the "least important." *See O'Donnell*, 2020 WL 3058098, at *7. It has also acknowledged,

however, that it "can take on greater importance in particular factual settings." *Id.* Specifically, in *O'Donnell*, the Court examined whether the weight of evidence counseled against release where the defendant's "proposed release would be into the same or a similar living situation he had" at the time of charged offense. *Id.* at *8. That situation applies equally here. According to the PTS report, defendant's sister has indicated her willingness to serve as a third-party custodian and to have defendant reside in her home pending trial. But that is the same address where defendant has lived for the past four years, which would encompass the litany of misconduct outlined above—including the charged offense—that defendant has committed since April 2018. Accordingly, the government has grave concerns about releasing him to the same environment from which he has regularly engaged in serious criminal activity.

### D. Nature and Seriousness of the Danger Posed by Release

The grievous bodily injury inflicted upon Individual C emphasizes the nature and seriousness of the danger posed by defendant's release. His case involves the unlawful possession and use of a deadly weapon that was modified and equipped in a manner to maximize its utility as a "weapon[] of war." *See United States v. Jennings*, 195 F.3d 795, 799 n. 4 (5th Cir. 1999) (quoting S. Rep No. 90–1501, at 28 (1968)). Accordingly, the potential consequences of inadequate forms of restraint cannot be overstated.

### IV. CONCLUSION

For the foregoing reasons, as well as those stated in the PTS Report, the government respectfully requests that defendant continue to be detained. No condition or combination of conditions will reasonably assure the safety of the community or his appearance at trial.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/Paul Mower*
PAUL MOWER
Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated: April 18, 2022